United States v. Brettschneider very clearly in the way that we replied to the government's brief. Specifically, when we look at the case of Scott Brettschneider, we have a letter. A letter that was not written by Mr. Brettschneider, a letter that was not authorized by Mr. Brettschneider, a letter that had zero effect on the outcome and determination of the government when it came to the admission of Mr. Marshall into the RDAP program. As we see this here, this particular case languished for roughly four years, starting in the Pennsylvania District Court. Nothing was happening there. For four years, 2014, 2015, 2016, 2017, into early 2018, nothing happened whatsoever with this case, until such time as the District of New York decided to take this up. This case came from one simple fact. Scott Brettschneider was a thorn in the side of the DA's office in Brooklyn and Queens. They had tried for many years to determine or trap Mr. Brettschneider in some kind of scheme for recantations of confessions for innocents in cases, and they simply couldn't get there. When they couldn't get there, the prosecutors decided that they had to get something. They had invested their time, their years, their effort into ensuring that they got something to show for this. Now, not more than two weeks ago, Attorney General Barr spoke on Constitution Day about this very same thing, dealing with 18 U.S.C. 1001, and specifically looked at a prosecutor like any person can become overly invested in a case. They spent years, they've become so assured of the rightness of their cause that they decide that this is what they have to do. They have to have their pound of flesh for what's happened here. Now, there's some very clear aspects. Number one, the materiality issue of this letter. There was zero materiality. In fact, so little materiality that the government changed their theory of prosecution during the second summation. We go through an entire case, the government gets through its second summation. The test is not whether the statement has an impact, it's whether it's intrinsically capable of having an impact. No, I don't agree with that at all, Your Honor. And looking at the materiality test that we've laid out, the government changes this theory, whether it did have some effect, not whether it was possibly capable in a vacuum of having some effect on someone. This materiality test is wholly different when we look at this. Now, even if we were to buy into that possibility of some effect, the materiality was zero here. The determination for Mr. Marshall's admission to RDAP had already been denied prior to this. And if we look at Mr. Bretschneider's involvement, he referred this out to Mr. Shabazz Mohamed. He had no direct impact and involvement in that. Mr. Shabazz Mohamed was not an employee of Mr. Bretschneider at the time. And in fact, when we look at this letter, it outlines that, yes, Mr. Marshall did have a drug problem. That was based on two years earlier, not one year earlier. When we look at the specifics of his substance abuse that was found in the northern district of New York, that was testified to by multiple attorneys, there's no dispute that Mr. Marshall had some kind of drug and alcohol abuse issue that was addressed by Mr. Shabazz Mohamed. Then the question becomes, what effect did this have? Now, the government chose not to put on a witness, the witness who actually received this letter and was going to take some determination based on this letter, they chose not to put them on. So we have no way of knowing what effect, if any, this had on the government as far as the time it even took, right? That's the government's attenuated argument here, is that somehow there was time taken out of the government employee's day, therefore it affected someone's ability to do their job. Well, the government chose tactically to not put on the employee who was no longer with the Bureau of Prisons to determine and testify to what kind of time they spent in working with this letter and even looking at it. I looked at it myself, it occupies three pages total in the record, the appendix 538 to 540. It takes an educated person about 30 seconds to go through it. Now, if we're going to adopt that argument... The letter did have false statements in it? I don't believe the letter does have false statements in it. I've looked at the letter, it explains that there are substance abuse issues and problems, and it actually doesn't ask any decision to be made. This is purely discretionary judgment on whether RDAP is appropriate and there's not even a call to action in this letter that RDAP be used. It just simply outlines that yes, Mr. Marshall had a problem. So this is... Go ahead. Go ahead, Governor. No, go ahead. This letter simply outlines that there was a history of substance abuse problem. And this wasn't someone off the street. This was a certified alcohol and substance abuse counselor. So we're looking at someone who, this is what they do for a living, and they specifically outlined that these did happen on the record that there was a substance abuse, alcohol and drug related problem. But again, it had no ability to influence anyone. When we look at the substance of the letter, worst case scenario, someone looked at it, threw it in a circular file. Now, if we're prepared to take the position that, you know, every time someone sends something to a government official and it pans out or doesn't pan out, that we're going to hold them up on an 18 USC 1001 violation, that's a scary, slippery slope for us to go down here. That's what we're looking at specifically in the Bretschneider case. You know, further to that, if we look at the recorded calls, the last recorded call is not something that Mr. Bretschneider is a party to. It's Mr. Shabazz Muhammad. It's Mr. Marshall. And it's, it's also Mr. Goldman. And they're, they're speaking about the letter not being good enough. And I cite in my brief, that they specifically were concerned that Mr. Bretschneider was not doing what they wanted him to do. So to move through so many different layers of what could have happened and what did affect things, we're very far attenuated from this. All right. You, you have some time for rebuttal. Let's hear from Mr. Gaynor. Good morning, your honors. May it please the court, Gilbert Gaynor for Appellant John Scarpa. Your honors, in Kelly versus United States in June of this year, the Supreme Court made an important point. Not every corrupt act by a federal or state official is a federal crime. This case makes a very similar point. Not every corrupt act by a participant in a state criminal trial, including a lawyer, is a, is a federal crime. This case involves bribery, a specific intent crime, and conspiracy, a specific intent crime. To hold Mr. Scarpa liable, the government would have to prove that he had the specific intent to offer or return for his testimony at Scarpa's client's murder trial. The record is devoid of evidence sufficient to convince a reasonable jury beyond a reasonable doubt that Scarpa had this necessary specific intent to offer a quid pro quo. Law enforcement intercepted, local law enforcement intercepted over 21,000 calls and numerous text messages from Mr. Gallman, an ex-felon who worked with Scarpa. And the government's case rests the crux of it on one of those calls on January 13th, 2015, a call made by Gallman to Scarpa after Gallman had visited Mr. Cherry in prison. And the government says that this call is explicitly, they explicitly discussed a quid pro quo. And this is... Aren't there calls where, um, uh, Scarpa and, and Gallman are discussing, uh, what, what Cherry was willing to do and, and, and what he wanted, and, and Scarpa seemed to agree? Well the only call that really relates to that is the January 13th call, your honor, and it doesn't say what the government says it says. It's not an explicit quid pro quo and one can't reasonably infer that. Well, I mean the question is whether it can be a reasonable inference. Uh, it's not surprising that there isn't, uh, explicit discussion of a quid pro quo, but, but, but these arguments were made to the jury, right? And the, and the jury concluded that, that they were sufficient. Well that's why we have sufficiency of the evidence review, your honor, why there's a process clause when you, we've got facts in this case which are really bad, very reprehensible, and I will, I will, will tell you that there is really strong evidence that Mr. Scarpa suborned perjury, but the specific intent to suborn perjury is not the same thing as the specific intent to offer a quid pro quo. The facts are sufficiently bad and they're, they're presented with a, uh, with evidence that, uh, Mr. Scarpa attempted to pack the witnesses and, uh, concocted a false story about a witness selling firearms to kids. This, these facts are egregious and on these facts it's possible a jury might have convicted Mr. Scarpa of anything, extortion, embezzlement, terrorism, you name it. But the point here is, is there specific intent, evidence of specific intent for a quid pro quo offered to Mr. Cherry. And when you go through this evidence carefully, it's just not there. So when you go back to that call, which the government says is explicit evidence of a quid pro quo, the, Mr. Gallman tells Scarpa, well, uh, there's a bunch of stuff that Cherry wants, but the only thing that he mentions is a pack of Newport cigarettes, which is evidentiary corroboration. He never says anything about a quid pro quo and Mr. Scarpa's knowledge of any such thing cannot be inferred from this or any other evidence in this case. It's not there. So when you look at it carefully, it's not there. The, um, government has a few other pieces of evidence. They say that Mr. Scarpa's behavior at trial was, was suspicious. Um, but because when, uh, the prosecutor at the state trial, uh, exposed, uh, what looked like a false testimony by Mr. Cherry, Mr. Scarpa became agitated and started text messaging, uh, Mr. Gallman. But this equally fits and perhaps better fits and doesn't support an inference of specific intent. It supports an inference that he's being, that he's aware that perjury is being exposed. Any lawyer under these circumstances would be agitated. Uh, there is simply nothing in this record, nothing that the government can point to, no solid, credible, reasonable evidence that a jury could rely on to say, yes, there's evidence of a quid pro quo. The government can't point to it. I'll reserve the rest of my time for rebuttal, your honors. All right. Thank you. We'll hear from the government. Good morning. My name is Andre Spector and I represent the government on this appeal. I was also the lead prosecutor in both trials below. I'll start with Mr. Bretschneider's appeal. So Bretschneider was a case fixer, Charles Gallman enlisted a substance abuse counselor to write a letter that was filled with false statements about Bretschneider's client's substance abuse and supposed long-term treatment. Those statements were designed to get Bretschneider's client into the RDEF to get him released early from prison. The letter was directed to the specific decision maker within the prison facility, Dr. Banks. It was as Dr. Hoffman testified professionally done incorporating treatment. Mr. Halscott argues that there was nothing false about the letter. Just point out a couple of things that the government contends is false. Absolutely, your honor. The recordings made plain that this whole letter was bogus. When Mr. Marshall wanted this letter, they started talking about unrecorded calls. And when he asked Mr. Bretschneider for this letter, Mr. Bretschneider's response is, I know who to talk to. Not, what program did you attend? It's, I know who to talk to. And I'm looking at appendix 317. And then when he got Shabazz Mohamed to do this letter, he informed Marshall that it's going to be the Shabazz program. Not that, you know, you went to this program, remember? That's appendix 339. When they brainstormed about the letter. Was there a Shabazz program? He was a substance abuse counselor, so it does seem like he had a program. But Mr. Marshall certainly didn't attend that program, and certainly not for seven years. You know, Mr. Marshall told Bretschneider, feel free to put drugs too, whatever you want. That's 327, 28. And I can go on, but the recordings were plain that this whole letter was false. And frankly, even below, they didn't argue strenuously that it wasn't false. There was some argument that Mr. Marshall did actually have some drug issues, and that is true. He did have substance abuse issues about 30 years ago, but he didn't have any ongoing substance abuse issue. Doesn't appear that the letter had any impact. Was there evidence that it had an impact? Well, it's not clear, Your Honor. It's clear that they reviewed the evidence. Certainly, you know, of course, the test is not whether it actually had impact. You know, the test is objective, but it's unclear. It seems like, and maybe it's in part because the BOP was notified that there was this fraudulent letter coming to them. You would hope that it wouldn't have any impact. But what the evidence with the record shows is that the letter was in fact reviewed, and it was found insufficient. But for purposes of materiality, as Your Honor noted, the question isn't whether the false statements are sufficient or dispositive. It's whether they have probative weight. In this letter, the record is uncontroverted that this letter had probative weight, because as Dr. Hoffman testified, a letter like this is considered in the discretionary decision made by the BOP. And it's just common sense that when the decision is whether someone should be admitted into a drug program, the fact that someone was treated for seven years and then left, not because he was cured, but just left, that that letter would have probative weight. And there's nothing to controvert that finding. So I don't know if you, Your Honor, have questions about Bretschneider. I'll move on to Scarpa. Mr. Scarpa was convicted after the jury heard him and his co-conspirator, Charles Gallman, bribing a witness. Gallman was Scarpa's right-hand man. Again, his case fixer, Judgement Ammon, accurately characterized him. And Gallman went to visit a witness whom Scarpa desperately wanted for his double homicide trial. This witness was the whole reason that Scarpa needed the witness to say. And Gallman, before, just to point to a piece of evidence, in addition to the key January 13th call, prior to the visit, Gallman said that if we can get him, he says this to another person, that if we can get him to come say what I need him to say, then Scarpa's client could win. And all Gallman had to do was enhance this witness's reputation in prison, because he was labeled a snitch, and to promise him with his appeal. And on January 13th, after the visit, Gallman confirmed to Scarpa that Scarpa was quote-unquote, okay, because Cherry was willing to play it whichever way Scarpa wanted. Those, you know, he's okay, if we can get him to say what I need him to say, those do not necessarily mean that he wanted him to lie. Well, that maybe by itself doesn't mean that he wanted him to lie. But other evidence, you know, Gallman is very explicit about what he needed him to say. He says, this is Appendix 805, if we get Lewis Cherry to come say what I need him to say, then they will be okay. And of course, then you have Cherry's testimony at trial, which everyone agrees was a lie. And it was not just a lie, because he has lied before, but it was a lie that navigated around all the trial evidence that Scarpa knew about. And it was almost bizarre in the way that it did so. So, this call certainly was key. And even the trial counsel below told the jury that it would be quote-unquote justified in concluding that this conversation showed at first blush that Gallman and Scarpa were bribing Cherry. Then he invited the jury to make a different inference, and certainly not the most logical inference, but the jury permissively declined to do so. I can address the 4-4-B evidence, if your honors, unless your honors have questions about the sufficiency point. The district court did not abuse its discretion in admitting the other act evidence related to Melvin Anderson. As your honors know, this court affords significant leeway in reviewing the admission of this an inclusionary approach to admitting 4-4-B evidence. But even without this double layer of deference, there was no error below, much less an arbitrary or irrational ruling. In the same month they bribed Cherry, Gallman and Scarpa talked about improperly influencing the testimony of a state witness. The district court admitted this evidence because it was relevant to intent, it was relevant to background, it was relevant to explaining the illegal relationship between the participants, and to complete the story. This was the same co-conspirator that Scarpa was involved with around the same time, the same trial, and with the same general goal in mind, which is to shape testimony. There was no error whatsoever below in admitting this testimony. Unless your honors have questions, I'm happy to rest in our submission. Thank you. Mr. Haskot, your rebuttal? Yes, your honor, briefly. It's important that I get out of the gate and distinguish us from Mr. Scarpa's case. These are two separate cases, so it's important that this court consider them separately. I know that you can, I just want to make sure that we understand that evidentiarily speaking, they are completely different cases. It's important to also point out here, the government mischaracterizes several different things. Not the least of which is Scott Bretschneider's statements that I know who to talk to. Of course he does. Lawyers refer clients to certified substance abuse counselors all the time. That's what they do, because they are not themselves dealing with substance abuse counseling. It's important to note on the record as well, that not once, but twice, and this is in the record evidence, on October 24th of 2014 and November 1st of 2014, that Mr. Bretschneider specifically asked, what programs have you taken? What have you done with regard to substance abuse? This wasn't some rubber stamp where, you know, Scott Bretschneider was a fixer. This is not at all what this was here. It's very clear here too, the government says, well, they didn't try and argue hard enough at trial that the letter was truthful. What does that even mean? The government's not going to weigh whether or not the argument was strong enough to persuade them that everything in the letter was truthful. And even if it wasn't, let's just go down that rabbit hole. The letter had no ability to influence anyone, okay? It wasn't solicited by Mr. Bretschneider. Let me go back to something you just said. Mr. Bretschneider said, what programs have you been in? And did he say Mr. Shabazz's program? This was soliciting Mr. Marshall on what programs he had been in to get an idea of what he had done. Because again, Mr. Bretschneider is not someone who's going to be... And did he say I was in that program, Mr. Shabazz's program? He said in general, in general that he was in programs. So, yes. So there was no nexus there, Your Honor. But again, when we look at the letter, we have to go back to, it wasn't on Mr. Bretschneider's letterhead. It wasn't written by Mr. Bretschneider. The substance of it wasn't solicited by Mr. Bretschneider. It didn't ask for anything. It didn't tell anyone to put Mr. Marshall into RDAP. The decision had already been made prior to this by the government's own timeline, not by our timeline. And it had no ability to influence anyone. Did he not play a role in the writing of the letter? He did not write the letter. Did he play a role in the writing of the letter? No, he did not, Your Honor. He did not play a role. He had nothing to do with the writing of the letter? He did not have anything to do with writing the letter. This was purely a referral to a certified substance abuse counselor. All right. Thank you. We'll hear from Mr. Gaynor. Thank you, Your Honor. Looking over what the government has said and considering it, we find the same absence of evidence that I pointed out in the briefs and in my opening argument. There is plenty here to convict Mr. Gallman. He indeed pled guilty and is presumably imprisoned at this moment. And there is perhaps enough to convict Mr. Scarpa of other crimes, subordination of perjury, although that's not why we're here. But the critical question that this court must ask in reviewing the sufficiency of the evidence is whether there's sufficient evidence of a quid pro quo on the part of Mr. Scarpa. And there simply isn't. There's the January 13th conversation. I noticed that the government doesn't offer much of a defense of that, because the only item of stuff mentioned in that is not a quid pro quo. It's a Newport pack of Newport cigarettes, which represents evidentiary corroboration. There is no reference, no even allusion in that conversation to a quid pro quo. It's simply not there. And when we get to the conversation that the government talks about, which is a conversation that Mr. Gallman had with somebody else, not Mr. Scarpa, in which he talks about getting Mr. Cherry to testify in a way that would be favorable to Mr. Ross, once again, there is no evidence in this record from which a jury could reasonably infer a knowledge of a quid pro quo on the part of Mr. Scarpa. When this court goes through the record, and I know it will, carefully looking for that we have an aggregation of unpleasant circumstances. We have behavior by a lawyer, which is reprehensible. We have evidence which, as we try to explain in our brief, should not have been admitted inflammatory evidence of attempting to intimidate another witness, and of creating a false story about another witness. These facts are bad, Your Honor, and I can't stand here and tell you anything else. But under these facts, bad as they are, there isn't, on the whole record, evidence of a quid pro quo or knowledge of a quid pro quo. There was no evidence that a quid pro quo was given. There was no benefit given to Mr. Cherry of any sort by Mr. Scarpa, and no evidence that Mr. Scarpa knew about or participated or consented to or agreed to the offer of any benefit for Mr. Cherry. And for that reason, we respectfully request that the court reverse with instructions to enter a judgment of acquittal. Thank you. Thank you.